### COMERFORD *v.* THE MELVINA.

*(District Court, N. D. Illinois.* March 31, 1890.)

1. COLLISION—VESSEL AT ANCHOR.

A schooner at anchor hoisted her sails in order to assist in loosening the anchor. When the anchor broke from the bottom, the schooner started with the master alone on deck, the entire crew being engaged at the windlass, and collided with another vessel lying at anchor a third of a mile to leeward. The evidence showed that the master of the schooner could have avoided the collision by putting his wheel hard to port. *Held,* that the schooner was responsible for the collision.

2. SAME—MEASURE OF DAMAGES.

Where a schooner's jib-boom is broken off by a collision, the vessel responsible therefor is also liable for demurrage caused by going into a port of repair, where there is any increase of risk in continuing the voyage without a jib-boom; though it is possible that the schooner might have made the voyage, successfully, but it is not liable for additional delay caused by want of skill in making the repairs.

In Admiralty.

*Thomas Hood,* for libelant.

*Schuyler & Kremer,* for respondent.

BLODGETT, J. This is a libel by the owner of the schooner Blazing Star for damages sustained by his schooner from a collision with the schooner Melvina in the waters of Lake Huron on the morning of October 17, 1888. The proof shows that, on the morning in question, the schooners Melvina and Blazing Star lay at anchor in the shelter of the east side of Cove island, in the entrance to the Georgian bay, where they had taken refuge from a gale about 36 hours before. The weather had become pleasant, with a moderate wind from the S. W. or S. S. W., and about 8 o'clock in the morning the crews of both schooners began preparations to get away, both being bound for Cheboygan, Mich., for cargoes of lumber to transport to the port of Chicago. The Melvina lay nearer the shore than the Blazing Star, and each was in from 16 to 17 fathoms of water. They were, as nearly as I can make it from the proof, about one-third of a mile apart, and each had out its heaviest anchor, with about 50 fathoms of chain. The crew of the Melvina were unable to break her anchor clear from its hold on the bottom by the windlass alone, and the sails were set to aid them in doing so, the result of which was that, when the anchor broke from the bottom, the schooner was standing on the port tack with her main boom a few feet over the starboard quarter, in a direction which took her close across the bows of the Blazing Star. The crew of the Blazing Star were at that time engaged in heaving at her anchor, but had not got it off the bottom, so that she was swinging on her chain with her bow in the wind. All hands, but the master of the Melvina, continued heaving at her anchor after it left the bottom for the purpose of getting it on board, and the master had the wheel, he alone attending to the navigation of his vessel. Possibly she made a little leeway without the master's being aware of it, but, whether that be so or not, she passed so close to the Blazing Star that her main lift caught the end of the jib-boom of the Blazing Star, and broke it off at the junction with the bowsprit, which is the direct damage complained of.

The master of the Blazing Star, instead of continuing his voyage after the collision, made sail for Owen's sound, which was in a contrary direction from Cheboygan, his port of destination, but, as the proof shows, was the nearest port of repair, where he arrived that evening. He ordered a new jib-boom, and the workmen set about making one, which it would seem, by good dispatch, should have been finished and in place by the evening of the next day, but, after working upon it nearly all the next day, it was found that the stick was defective, and a new stick had to be obtained and finished and put in place,—thus necessitating a delay of two days for repairs at Owen's sound; and it is for the cost of the new jib-boom, and the time lost in going to and from Owen's sound, and the detention there, that damages are claimed by libelant.

The defenses urged are: (1) That the collision was an unavoidable accident, caused by the direction of the wind and the positions of the two vessels in relation to each other at the time the Melvina's anchor broke from the bottom; (2) that there was no maritime necessity for the Blazing Star to seek a port of repair merely to have her jib-boom replaced, but that she could have safely pursued her voyage to Cheboygan, and had a new jib-boom put in while taking in her cargo of lumber there.

In support of the first proposition, it is contended by respondent that, when the aid of the sails of a vessel is resorted to for the purpose of breaking her anchor from its hold on the bottom, she will necessarily go off on whatever tack she may be standing at the time the anchor breaks; and that with this heavy anchor, and some 17 fathoms of chain hanging in the water, the steerage of the Melvina was so much interfered with that it would have been unsafe to attempt to carry her astern of the Blazing Star, as, with the short distance she had to run, the Melvina would almost inevitably have struck the hull of the Star instead of going astern of her.

It is also contended that the crew of the Blazing Star should have seen there was danger of collision with their jib-boom, and should have slacked off on their windlass, which would have let the Star fall astern, and thereby enabled the Melvina to have gone clear. I do not think either of these positions is well taken. The master of the Melvina knew, or should have known, as a skillful and experienced seaman, that, when he resorted to his sails to assist him in weighing anchor, his vessel would go off on whatever tack she stood when the anchor broke, and with this other vessel to the leeward of him, and consequently in peril of collision with her, it was his duty to have taken such precautions as would have averted the collision. He must have seen the moment his anchor broke, and his vessel began to make headway, that his direction would take him very close to the forward end of the Star's jib-boom; and that passing so close to her involved, not only the peril of carrying away the Star's jib-boom and bowsprit, but also that his anchor might foul with the Star's chain if he passed with his anchor hanging in the water across the chain of the Star. He was one-third of a mile away from the Star. He could have dropped his anchor back upon the bottom, and so retarded the speed of his vessel that she would have swung enough upon her chain to

change her direction, or he could have called help enough from the windlass to aid him in the navigation of his vessel until she was past danger of a collision. The proof shows that, if a single man had been on deck, to have hauled in the main boom from over the starboard quarter of his vessel, she would have gone clear of the Star's jib-boom, for, as it was, the main lift barely caught the tip end of the Star's jib-boom, but enough to break it. But with what, it seems to me, was an act of recklessness, the master of the Melvina undertook to navigate his vessel without any help on deck to enable him to properly manage her, when he must have seen that he was endangering both vessels by attempting so close a passage across the Star's bow.

As to the alleged negligence of the crew of the Star in not slacking off their chain so as to allow their vessel to fall astern, and thereby escape the collision, I do not think the point is supported by the proof. The crews of both vessels seem to have thought the Melvina would pass safely, although so close, until she was nearly one-half her length past the Star's jib-boom; and I do not think, from the proof, that the Star would have settled back soon enough to have averted the collision if her chain had been slacked. As I understand the situation from the proof, the Star was not using her sails to help break her anchor, so that the only force to carry her astern was the wind acting upon her hull and rigging as she lay in the eye of the wind; and it is not probable that this force would have acted with sufficient rapidity to carry her out of danger,—at least, it is doubtful if such would have been the effect of slacking off upon the Star's chain; and, with the palpable want of due care shown by the master of the Melvina, I do not think he, or those responsible for his acts, are in a position to closely criticise the conduct of the crew of the Star.

The proof also satisfies me that, after the danger of collision became imminent, the master of the Melvina could have averted it, and passed clear of the Star, by putting his wheel hard to port, which would have swung his stern to port, and thereby cleared the Star's boom. He was certainly bound to think and to act as quickly, under the circumstances, as the crew of the Star, and he has no right to complain if they did not adopt measures when *in extremis* while he was himself guilty of neglecting measures at the same moment which probably would have been effective.

As to the contention that the master of the Star should have pursued his voyage to Cheboygan without his jib-boom, and made his repairs there, I think that, under the circumstances, the master of the injured vessel was the judge as to whether he would take the risk of making the run to Cheboygan without the aid of the sails dependent upon the jib-boom, or seek a port of repair. It is possible that he would have made the run successfully, but, if to the mind of a prudent seaman there was any increase of risk in attempting it, then he had the right to decide whether he would take that risk or not, and it does not lie in the mouth of the party by whose negligence he has been disabled to criticise his exercise of discretion. It is true that the proof shows that good seamen

have made trips the whole length of Lakes Michigan and Huron with the jib-booms of their vessels gone, but this only proves that they were fortunate in not encountering such winds as would have made the sails dependent on the jib-booms necessary for safety. Undoubtedly many of the members of a full-rigged schooner may be temporarily dispensed with, but this does not prove that it is prudent seamanship to attempt the continuance of a voyage after so essential a part of a schooner as the jib-boom has been carried away. At the most, it only proves that the man who has taken such a risk may be deemed lucky if he gets through in safety. We must bear in mind that this collision occurred after the middle of October, when severe storms are to be anticipated, especially on Lake Huron; and I think the master of the Star only acted with proper prudence in running to the nearest port of repair, which, in this case, he was able to do with a fair wind, and mostly in a protected course. As to the damages to be awarded, the libelant is entitled to be paid all expenses for repairs made necessary by the collision. These are the cost of replacing the jib-boom and the portions of rigging which were broken. He is also entitled to be made good, as far as possible, for the time necessarily lost in going to the port of repair, waiting there for repairs, and returning to the point where the collision occurred, or as far on the voyage as the point where the collision occurred. The proof shows that the Star reached Owen's sound the evening after the accident, but too late to get men at work on the new jib-boom that night. The next day the new jib-boom would have been made and put in place in time for him to have left the morning of the third day, but the party who undertook the repairs chose a bad stick of timber, the defect of which was not discovered until they had worked nearly all day upon it, when the stick was rejected, and a new stick obtained, which took them a day longer. This loss of a day, by the want of skill of those who undertook the making of the new jib-boom, ought not to be charged to the respondent. I therefore find that the detention of the Star in going to Owen's sound, and returning to a point on her voyage equivalent to the place of accident, was three days, and that her time and expenses were equal to $50 per day, making the amount of her recovery the cost of the repairs, and the three-days demurrage, at $50 per day.

It is also contended that, as the Star reached Cheboygan, got in her cargo, and left there for Chicago as soon as the Melvina and the Fellowcraft, another schooner which lay at Cove island with the Star and Melvina, and left there with the Melvina, therefore no demurrage should be allowed her, because she might not have got there, taken on her cargo, and got away any sooner if the injury by the collision had not occurred; but, as the proof shows that the Star did not load at the same dock as the other two vessels, I do not think the court can presume she would have been detained in Cheboygan as the other vessels were. A decree may therefore be prepared, finding the Melvina in fault, and awarding damages to be made of the actual cost of repairs, and the three-days demurrage, at $50 per day.